1  CHRISTENA GEORGAS-BURNS, ESQ.
   Nevada Bar No. 14314C
2  DAVID OLSHAN, ESQ.
   Nevada Bar No. 4126
3  NEVADA LEGAL SERVICES, INC.
   530 S. 6th Street
4  Las Vegas, Nevada 89101
   (702) 386-0404
5  dolshan@nlslaw.net
   Attorneys for Plaintiff
6
7
8              UNITED STATES DISTRICT COURT
                  DISTRICT OF NEVADA
9
   **OLIVER BRUCE MORRIS,**
10                                          **Case No. 2:19-cv-00569-GMN-DJA**
       **Plaintiff,**
11                                          **MOTION FOR SUMMARYJUDGMENT/**
                                            **MEMORANDUM OF POINTS AND**
   **v.**                                   **AUTHORITIES**
12
   **MICHAEL R. POMPEO, in his official**
13 **capacity as the Secretary of State.**

14
              **Defendant.**
15

16          The Defendant, MICHAEL R. POMPEO ["Secretary" or "Defendant"], has admitted[1] to

17  requiring Plaintiff, OLIVER BRUCE MORRIS ["Oliver"], to produce a doctor's note and force

18  a medical examination or undergo medical treatment before granting a male gender marker[2] on

19  a passport.[3]  Oliver, by his attorneys, hereby files his Motion for Summary Judgment pursuant

20  to Fed. R. Civ. P. 56 because this policy violates the law.

21  _____
   [1] Defendant's Motion to Dismiss, Motion for Summary Judgment, and Memorandum of Points
22  and Authorities ["Motion"] (ECF #25) at 1.
   [2] The term "gender" mirrors language in the Foreign Affairs Manual and provides more accuracy
23  than "sex" because the Secretary never verifies sex, genetic indicators, or sex genitalia, but the
   gender marker on documents.
24  [3] Motion (Doc. #25) at 1.

                            1

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Oliver wanted a passport card as an additional form of identification and to travel to Mexico, and applied for a passport on October 13, 2018. Born in Modesto, CA and designated female at birth, Oliver has been living as a male since January 2015.[4] Oliver's passport application was denied.[5]

Oliver now challenges the Secretary's policy of requiring medical certification or a doctor's note for any passport applicant who "indicates a gender on the 'sex' line on the passport application with information different from the one reflected on some or all of the submitted citizenship and/or identity evidence, including a prior passport."[6] The doctor's note must verify that the applicant "has had appropriate clinical treatment for gender transition to the new gender of either male or female."[7] The Secretary's policy of requiring medical treatment before Oliver can obtain a passport reflecting his gender is a violation of Fifth Amendment of the U.S. Constitution, which protects the right to refuse medical treatment and prohibits discrimination based on sex.[8]

This Complaint/Petition for Judicial Review presents the Court with two possible standards: (1) Summary Judgment and the standards under Fed. R. Civ. P. 56 or (2) a Petition for Judicial Review under the APA. Oliver will address both standards below, demonstrate why he is entitled to judgment as a matter of law, and show that the Secretary's decision to deny a passport according to the Policy is arbitrary, capricious, and contrary to law.

---

[4] First Amended Complaint ["FAC"] (ECF #13) at ¶15.
[5] AR at 28-29.
[6] 8 FAM 403.3-1(a).
[7] 8 FAM 403.3-2(B)(d)(5).  This doctor's note requirement will be referred to as the "Policy" throughout this Motion/Memo.
[8] *See Wash. v. Glucksberg,* 521 U.S. 702, 720 (1997); *see also Bolling v. Sharpe*, 347 U.S. 497 (1954) ("discrimination may be so unjustifiable as to be violative of due process").

STATEMENT OF FACTS

On October 9, 2018, Oliver submitted an application for a U.S. passport card to the Secretary.[9] Oliver listed his gender as male and included a California birth certificate in the name "Chanesse Olivia Morris" with the gender listed as female.[10] Oliver obtained a name change order that legally changed his name to Oliver Bruce Morris and a Nevada driver's license that listed Oliver's gender as male.[11]

The Secretary denied Oliver's passport card request based on the Policy and, on October 24, 2018, sent a letter to Oliver indicating that "[i]n order to issue you a passport card reflecting a sex different from the one on some or all of your citizenship and/or identity evidence, please send us a signed original statement on office letterhead from your attending medical physician" indicating "that you have had appropriate clinical treatment for transition to the new sex."[12]

Oliver did not respond and, on January 24, 2019, the Secretary sent the identical letter titled "FINAL REQUEST" indicating that the application may be denied unless Oliver provided the requested certification within ninety days.[13] At the time, Oliver was not seeing a doctor. He could not supply the doctor's note without first buying health insurance and then finding a doctor and undergoing medical treatment other than the hormone treatment that Oliver was pursuing from a Nurse Practitioner.[14] Oliver's counsel sent a letter to the Secretary on February 22, 2019, indicating that Oliver would not supply the requested certification because Oliver "cannot afford any gender transition treatment right now" and because "he does

---

[9] AR (ECF #20) at 1-2.
[10] *Id.* at 4.
[11] *Id.* 3, 5.
[12] *Id.* at 7-8.
[13] *Id.* at 9.
[14] *Id.* at 20.

not need any medical intervention for a gender transition."[15] Oliver's letter also indicated that the Secretary's Policy violated the Constitution and that Oliver wanted a hearing to present his case.[16]

On March 26, 2019, the Secretary sent the same letter to Oliver, denying his passport application and requesting the doctor's note within ninety days.[17] On April 5, 2019, Oliver initiated the complaint with this Court.[18] On May 21, 2019, the Secretary sent Oliver a letter formally denying the passport application pursuant to 22 C.F.R. § 51.23.[19]

STATUTORY AND REGULATORY AUTHORITY

A passport is "a travel document regardless of format issued under the authority of the Secretary of State attesting to the identity and nationality of the bearer."[20] It can be used as a travel document and a diplomatic "letter of introduction in which the issuing sovereign vouches for the bearer and requests other sovereigns to aid the bearer."[21] The Passport Act "centralized passport authority in the Federal Government[22] and gave the Secretary of State authority to "grant and issue passports . . . under such rules as the President shall designate and prescribe for and on behalf of the United States."[23] The President delegated this authority to prescribe rules for the issuance of passports to the Secretary of State.[24] As such, the Secretary of State

---

[15] AR at 11.
[16] Id.
[17] Id. at 12-13.
[18] Id. at 14.
[19] Id. at 28–29.
[20] 22 C.F.R. § 51.1.  The passport also provides proof of citizenship for employment and Real ID purposes.  See I-9 Form at page 3 https://www.uscis.gov/i-9 and https://dmvnv.com/dlduplicate.htm#realh3 for Nevada's Real ID requirements.
[21] Haig v. Agee, 453 U.S. 280, 292 (1981).
[22] Agee, 453 U.S. at 294.
[23] 22 U.S.C. § 211a.
[24] Exec. Order No. 11295, 31 Fed. Reg. 10, 603 (Aug. 9, 1966).

promulgated regulations governing passports and their content.[25] In order to obtain a passport, "the applicant has the burden of establishing his or her identity . . . by the submission of a previous passport, other state, local, or federal government officially issued identification with photograph, or other identifying evidence which may include an affidavit of an identifying witness."[26] In addition, "[t]he Department may require such additional evidence of identity as it deems necessary."[27]

The Secretary promulgated a new policy in 2010 specifically targeting applicants who seek a passport with a sex designation that differs from that listed on the government identification document submitted as part of the passport application.[28] According to this new policy, in order for an applicant who is transgender to obtain a passport with a sex designation different from the one reflected on the submitted citizenship or identity evidence, the applicant must present "certification, done under penalty of perjury, from the attending medical physician . . . [demonstrating] that the applicant has had appropriate clinical treatment for gender transition" or "is in the process of gender transition."[29] While this policy eliminated the previous requirement that an applicant undergo sex reassignment surgery in order to obtain a passport with a new sex designation, it established that the applicant must submit medical documentation of their transition in the form of the physician's certification.[30]

Because of this policy, in addition to furnishing "acceptable Identification Document(s) (IDs) in the new gender, and name, if applicable,"[31] the applicant must present "a signed, original certification or statement, on office letterhead, from a licensed physician who has

---

[25] *See* 22 C.F.R. §§ 51.1–51.74.
[26] 22 C.F.R. § 51.23(a)–(b).
[27] *Id.* at § 51.23(c).
[28] *See* A.R. 33–41; *see also Id.* at 42.
[29] Action Memo for Assistant Secretary Jacobs (May 14, 2010), AR at 31; *see also* AR at 33–41.
[30] AR at 34.
[31] 8 FAM 403.3-2(A)(b), AR at 107.

treated the applicant for her/his gender-related care or reviewed and evaluated the gender-related medical history of the applicant."[32] In order for the certification to be valid, it must include the physician's full name, medical license or certificate number, address, and telephone number,[33] and contain language stating that (1) the physician "has treated the applicant or has reviewed and evaluated the medical history of the applicant and that she/he has a doctor/patient relationship with the applicant"; (2) "the applicant has had appropriate clinical treatment for gender transition to the new gender of either male or female"; and (3) the certification is submitted under penalty of perjury.[34] By requiring this additional medical evaluation and certification for applicants who are transgender, the Secretary has established different standards for people who are transgender.

## STANDARD OF REVIEW UNDER RULE OF CIVIL PROCEDURE 56

Fed. R. Civ. P. 56 and LR 56-1 allow Oliver to file a motion requesting summary judgment. Under Fed. R. Civ. P. 56(a), Oliver must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law.[35] A fact is material only if it is one that "under the governing substantive law . . . could affect the outcome of the case."[36] A factual issue is genuine if "a jury could reasonably find in the nonmovant's favor. . . ."[37]

Oliver has the initial burden of establishing that no genuine issue of material fact exists or that a material fact essential to the non-moving party's claim is absent.[38] Once he has met his

---

[32] 8 FAM 403.32(B)(a), AR at 108; *see also* 8 FAM 403.3-8, AR at 114.

[33] 8 FAM 403.3-2(B)(d)(1)–(3), AR at 108–09.

[34] *See* 8 FAM 403.3-2(B)(d)(4)–(6), AR at 109.

[35] Fed. R. Civ. P. 56(a).

[36] *Caneva v. Sun Communities Operating Ltd. P'Ship (In re Caneva),* 550 F.3d 755, 760 (9th Cir. 2008).

[37] *Emeldi v. Univ. of Oregon,* 698 F.3d 715, 730 (9th Cir. 2012).

[38] *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

1    burden, the Secretary must establish that there is a genuine issue of material fact.[39] The

2    Secretary cannot avoid summary judgment by relying solely on unsupported, conclusory

3    allegations.[40] The Court views the evidence and reasonable inferences in the light most

4    favorable to the Secretary.[41] If the evidence of the Secretary is merely colorable or is not

5    significantly probative, summary judgment may be granted.[42]

6                          STANDARD OF REVIEW UNDER APA

7          Under the Administrative Procedure Act (APA), a "reviewing court shall . . . hold

8    unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary,

9    capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to

10   constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction,

11   authority, or limitations, or short of statutory right . . . ."[43] "To have not acted in an arbitrary

12   and capricious manner, the agency must present a 'rational connection between the facts found

13   and the conclusions made.'"[44] These standards require the court to engage in a substantial

14   inquiry and a "probing, in-depth review."[45]

15         A court reviewing agency action under the arbitrary and capricious standard must

16   ascertain whether the agency "considered the relevant factors and articulated a rational

17   connection between the facts found and the choice made."[46] Agency action should be set aside

18   "if the agency relied on factors which Congress has not intended for it to consider, entirely

19   failed to consider an important aspect of the problem, offered an explanation for its decision

20   [39] *Fairbank v. Johnson*, 212 F.3d 528, 531 (9th Cir. 2000).
     [40] *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).
21   [41] *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).
     [42] *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1048 (9th Cir. 1995)
22   [43] 5 U.S.C. § 706(2); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413 (1971);
     *Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007).
23   [44] *Brong*, 492 F.3d at 1125 (internal citation omitted).
     [45] *Citizens to Preserve Overton Park*, 401 U.S. at 415-16.
24   [46] *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003).

7

that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[47] The 'arbitrary and capricious' standard requires an agency's action to be supported by the facts in the record.[48] Questions of law, including constitutional claims, require *de novo* review.[49]

ARGUMENT

I.   SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE THE POLICY VIOLATES THE U.S. CONSTITUTION AND THE SECRETARY HAS NOT ALLEGED FACTS OR A LEGAL ARGUMENT TO JUSTIFY IT.

The Fifth Amendment in the U.S. Constitution protects a person's fundamental rights, including the right to refuse medical treatment,[50] and prohibits the government from discriminating against a person based on sex.[51] If a government action violates a person's fundamental right to refuse medical treatment, then the government must overcome strict scrutiny.[52] In addition, if a government action discriminates against a person based on sex, the government must satisfy intermediate scrutiny.[53] Here, the Secretary's Policy unconstitutionally violated Oliver's fundamental right to refuse medical treatment and discriminated against Oliver based on sex and the Secretary has not alleged facts or a legal argument sufficient to justify the policy.  Therefore, summary judgment should be granted.

**A. The Secretary's Policy of Requiring Medical Treatment Before Oliver Can Obtain a Passport Reflecting His Gender is a Violation Of His Fundamental Right To Refuse Medical Treatment.**

---

[47] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 43 (1983).
[48] *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.,* 273 F.3d 1229, 1236 (9th Cir. 2001).
[49] *Partridge v. Reich*, 141 F.3d 920, 923 (9th Cir. 1998); *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1030 (10th Cir. 2001).
[50] *Wash. v. Glucksberg,* 521 U.S. 702, 720; *Cruzan v. Dir., Mo. Dep't of Health,* 497 U.S. 261, 279 (1990).
[51] *Reed v. Reed*, 404 U.S. 71, 75 (1971).
[52] *Reno v. Flores*, 507 U.S. 292, 301-02 (1993).
[53] *Craig v. Boren*, 429 U.S. 190, 197 (1976).

8

1    The Due Process Clause in the Fifth Amendment of the United States Constitution

2    provides that no person shall "be deprived of life, liberty, or property, without due process of

3    law."[54] In addition, the Fifth Amendment Due Process Clause "forbids the government to

4    infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, unless

5    the infringement is narrowly tailored to serve a compelling state interest."[55] In this case, the

6    Secretary's Policy infringes on Oliver's fundamental liberty interest in the right to refuse

7    medical treatment and the Secretary has failed to alleged a compelling interest narrowly tailored

8    to serve the interest, therefore the Policy is a violation of the Fifth Amendment of the U.S.

9    Constitution.

10       i.   *The right to refuse medical treatment is a fundamental liberty interest protected by the*
            *Due Process Class in the Fifth Amendment of the U.S. Constitution.*

11

12       It is well-established that the right to refuse medical treatment is a fundamental liberty

13    interest protected by the Constitution.[56] Since its inception, our Constitution has mandated that

14    the government cannot force an individual to undergo a medical examination,[57] a blood test,[58] a

15    pat down by a police officer,[59] or medical treatment.[60] This right to refuse medical treatment is

16    enshrined in the Due Process Clause of our Constitution;

17

18    [54] U.S. Const. Amend. V.
      [55] *Flores*, 507 U.S. at 301-302.
19    [56] *Glucksberg*, 521 U.S. at 720 (stating the Supreme Court has "also assumed, and strongly
      suggested, that the Due Process Clause protects the traditional right to refuse unwanted
20    lifesaving medical treatment."); *see also Cruzan*, 497 U.S. at 279 (a competent person has a
      "constitutionally protected right to refuse lifesaving hydration and nutrition."); *Id.* 497 U.S. at
21    287 (concurring) ("the liberty guaranteed by the Due Process Clause must protect, if it protects
      anything, an individual's deeply personal decision to reject medical treatment, including the
22    artificial delivery of food and water.").
      [57] *Union P.R. Co. v. Botsford*, 141 U.S. 250, 251-55 (1891) (citation omitted).
23    [58] *Fong Sik Leung v. Dulles*, 226 F.2d 74 (9th Cir. 1955).
      [59] *Terry v. Ohio*, 392 U.S. 1 (1968)
24    [60] *McKay v. Bergstedt*, 801 P.2d 617, 622 (Nev. 1990).

1
2
3

> [N]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.[61]

4    The right to bodily integrity and the right to be free from unwanted touching remain

5    cornerstones of due process protection.[62] This is evident in the general requirement for

6    informed consent to medical treatment and the fact that an individual "generally possesses the

7    right not to consent, that is, to refuse treatment."[63] Thus, "a competent person has a

8    constitutionally protected liberty interest in refusing unwanted medical treatment. . . ."[64] As the

9    Supreme Court in *Washington v. Glucksberg* highlighted, "given the common-law rule that

10   forced medication was a battery, and the long legal tradition protecting the decision to refuse

11   unwanted medical treatment, our assumption [that there is a right to refuse unwanted medical

12   treatment] was entirely consistent with this Nation's history and constitutional traditions."[65]

13   This interest in freedom from unwanted medical treatment specific to people who are

14   transgender is reflected in multiple state laws, which show a move toward self-identification

15   instead of medical proof to change one's gender on identification forms, like a birth certificate

16   or a driver's license. Specifically, Nevada, along with 12 states and the District of Columbia,[66]

17   allow for non-binary or "X" designations on a driver's license, reflecting advancement toward

18

---

19   [61] *Botsford,* 141 U.S. at 251.
     [62] *Rochin v. California,* 342 U.S. 165, 173-74 (1952); *Glucksberg,* 521 U.S. at 720.
20   [63] *Cruzan,* 497 U.S. 261 at 270; see also *Glucksberg,* 521 U.S. at 720 (stating the Supreme Court has "also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment.").
21   [64] *Cruzan,* 497 U.S. at 278.
     [65] *Glucksberg,* 521 U.S. at 725.
22   [66] https://www.usatoday.com/story/news/nation/2019/08/08/nonbinary-gender-ids-momentum-intersex-state-driver-licenses/1802059001/; see also *How Trans-Friendly Is The Driver's License*
23   *Gender Change Policy In Your State?,* National Center for Transgender Equality, https://transequality.org/sites/default/files/docs/id/Drivers%20License%20Grades%20Nov%202
24   019.docx.pdf.

10

self-identification.[67] Nine states and New York City do not require a medical provider signature in order to change the sex designation on a birth certificate.[68] The Nation's history and traditions have not changed simply because a person is transgender.

Moreover, the Policy assumes medical treatment is necessary in *every* transgender case and that *every* transgender applicant suffers from a condition called gender dysphoria. According to the Secretary, the Policy:

> Articulate[s] professional consensus about the psychiatric, psychological, medical, and surgical management of gender identity disorders. . . . Accordingly, the Department [Secretary] determined that an applicant's physician would be a reliable source to verify the applicant's sex designation. . . .[69]

The focus is on gender identity disorders and, because this malady is assumed about *every* transgender applicant, the discriminatory nature of this Policy is readily apparent. Requiring every transgender applicant to produce a doctor's note places an additional burden on a discrete group based on sex.

Understanding a transgender person begins with no longer viewing gender nonconformity as a sickness or disease of the mind or body.[70] Being transgender, or a gender that differs from birth gender, is not a malady. The Diagnostic and Statistical Manual (DSM) of the American Psychiatric Association defines "gender dysphoria" as:

> the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender. Although not all individuals will

---

[67] Currently, the Secretary does not have a policy to address identity documents without a gender marker or a gender marker that does not fit the binary.
[68] *Summary of State Birth Certificate Gender Change Laws*, National Center for Transgender Equality, https://transequality.org/sites/default/files/docs/id/Summary%20of%20State%20Birth%20Certificate%20Laws%20October%202019.pdf.
[69] Motion at 4.
[70] *The Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* ("SOC"), World Professional Association For Transgender Health Version 7 at 4-5 (2011).

11

experience distress as a result of such incongruence, many are distressed if the desired physical interventions by means of hormones and/or surgery are not available. The current term is more descriptive than the previous DSM-IV term *gender identity disorder* and focuses on dysphoria as the clinical problem, not identity per se.[71]

DSM-5 emphasizes the primacy of self-identification, eschewing the pejorative label of "dysphoria" to a gender transition decision and only applying this label to those decisions that involve distress.[72] More importantly, the focus is on transgender self-identification, *vis-a-vis* the rejection of birth assignment of gender and the use of "gender identity" or the individual's identification as male, female, or "some category other than male or female."[73] In other words, changing gender only requires medical treatment when accompanied by anxiety or stress.

The latest version of the Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7 (SOC), published in 2011, describes the most current understanding of the transgender experience. The SOC is issued by a multidisciplinary professional association (the World Professional Association for Transgender Health or WPATH). The SOC emphasizes the common medical understanding, that "being transsexual, transgender, or gender nonconforming is a matter of diversity, not pathology."[74] WPATH also urges the "de-psychopathologization" of gender by not viewing gender changes as a mental illness.

> The expression of gender characteristics, including identities, that are not stereotypically associated with one's assigned sex at birth is a common and culturally diverse human phenomenon [that] should not be judged as inherently pathological or negative.[75]

---

[71] DSM 5 (American Psychiatric Association, 2013) at 451.
[72] DSM-5 at 451.
[73] *Id.*
[74] SOC at 4.
[75] The World Professional Association for Transgender Health, Policy Statement of May 26, 2010 at 1.

12

As a result, medical experts know that a transgender or a gender nonconforming person does not automatically have any medical issue requiring a doctor. As the APA describes:

> Gender dysphoria is not the same as gender nonconformity, which refers to behaviors not matching the gender norms or stereotypes of the gender assigned at birth. Examples of gender nonconformity (also referred to as gender expansiveness or gender creativity) include girls behaving and dressing in ways more socially expected of boys or occasional cross-dressing in adult men. Gender nonconformity is not a mental disorder. Gender dysphoria is also not the same as being gay/lesbian.[76]

Adopting behavior that is not stereotypically associated with one's birth gender does not render you infirm: it is a choice, not a sickness.

Some people who are transgender suffer from "gender dysphoria,"[77] but it is simply wrong to assume *all* people who are transgender suffer from this problem.[78] DSM-5 emphasizes that not every transgender individual "experience[s] distress" requiring medical attention.[79] The stigma attached to gender nonconformity is "not inherent to being transsexual, transgender, or gender nonconforming."[80] Often, gender dysphoria and minority stress are linked, so that any mental distress caused by gender nonconformity is attributable to society and not the person who is transgender.[81] People who are transgender face "even greater levels of societal discrimination and marginalization" than gay or lesbian persons.[82] That some people who are transgender and gender nonconforming experience gender dysphoria does not mean *all* experience it because, "to every experience, each of us brings our own schemas, attitudes, and

---

[76] https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria
[77] *See* Katherine Schreiber, "Why Transgender People Experience More Mental Health Issues," *Psychological Today* (December 6, 2016) (where about 18% of transgender people suffer from "some iteration of an anxiety disorder").
[78] *Doe v. Shanahan,* 917 F.3d 694, 696 (D.C. Cir. 2019).
[79] *Id.*
[80] *Id.*
[81] Hendricks, M. L., & Testa, R. J., "A conceptual framework for clinical work with transgender and gender nonconforming clients: An adaptation of the Minority Stress Model." *Professional Psychology: Research and Practice, 43*(5) (2012) at 460-467.
[82] *Norsworthy v. Beard,* 87 F.Supp. 3d 1104, 1119 (N.D. Cal. 2015).

1    expectations."[83] The individual retains the right to identify and express a gender that differs

2    from the birth gender and should have that right without fear of being labeled ill. There is

3    nothing wrong physically or mentally with an individual who claims a gender other than birth

4    gender and, even if there may be a gender identity disorder, this problem may result from

5    societal discrimination and minority stress, problems exacerbated by the Secretary's bias

6    against transgender applicants.

7        Further, the argument that this Policy does not actually require medical treatment for

8    every applicant who is transgender but only certification of a gender transition is ludicrous.

9    According to the Foreign Affairs Manual, the doctor must verify that the applicant "has had

10    appropriate clinical treatment for gender transition to the new gender of either male or

11    female."[84] The Secretary tries to minimize the harsh requirement of the Policy by stating that

12    the Secretary "does not require any particular treatment, as long as the certifying physician

13    determines that the applicant has received 'appropriate clinical treatment.'"[85] The Policy does

14    not require *specific* medical treatment, but it requires a person who is transgender to subject

15    themselves to a medical evaluation because they are transgender and only by a doctor of

16    osteopathy (D.O.) or a medical doctor (M.D.).[86] The Policy requires a person who is

17    transgender to seek treatment from a doctor, something usually only done when the person

18    suspects there is something medically wrong, regardless of whether the person is experiencing

19    gender dysphoria.

20        Not only does this Policy require all people who are transgender who want a passport to

21    seek medical treatment, it wrongfully assumes all people who are transgender need medical

---

[83] Dr. Rajiv Jhangiani and Dr. Hammond Tarry, Principles of Social Psychology, 311 (1st Int'l ed. 2011).
[84] 8 FAM 403.3-2(B)(d)(5).
[85] Motion at 11.
[86] 8 FAM 403.3-2(B)(b).

treatment because they are transgender. The Secretary tries to minimize the harsh presumption that all transgender applicants suffer from gender dysphoria by pointing out "medical professionals play a prominent role in the lives of people with gender identity disorders."[87] Requiring a doctor's note for *all* gender marker changes on a passport ignores the reality of the transgender experience and contradicts medical evidence.

There is nothing wrong with the body or mind of Oliver. Oliver does not need *any* medical treatment to be transgender and the vast majority of medical experts agree. Despite Oliver not needing medical treatment and not having a doctor at the time of application, the Secretary required Oliver to undergo medical evaluation and treatment in order to obtain a passport. The doctor is free to recommend any treatment, yet Oliver has no freedom to refuse this medical treatment. While a good doctor follows Oliver's needs and wants, even if it means no medical treatment, the very requirement of having a medical examination is a violation of Oliver's fundamental right to refuse medical treatment protected by the Due Process Clause of the Fifth Amendment.

By subjecting a person to a doctor to certify gender transition, a person is being forced to consent to an invasion of the body, one of a person's most private aspects of life, even if no treatment is ultimately ordered by the doctor. A doctor is not a gender umpire, deciding who is male or female, and medical care does not define a person's gender. As a result, this requirement to seek medical treatment and provide proof of "appropriate clinical treatment for gender transition" is a violation of Oliver's fundamental liberty interest to refuse medical treatment and can only be upheld if this court finds there is a compelling government interest that outweighs Oliver's interest.

---

[87] Motion at 11.

1

2

      *ii. The Secretary has not alleged a compelling government interest or adequately supported the Policy as narrowly tailored to protect Oliver's interest in refusing medical treatment.*

3           Because the right to refuse medical treatment is a fundamental liberty interest protected

4 by the Fifth Amendment, the government must prove that there is a compelling interest and the

5 means of serving that interest is narrowly tailored.[88] In this case, the Secretary stated the goal of

6 the Policy is "to protect the integrity of the U.S. passport as proof of U.S. citizenship/non-

7 citizen U.S. nationality and identity at home and abroad."[89] In an attempt to elevate this

8 interest, the Secretary claims "[i]ssuing passports that accurately state the bearer's identity is a

9 government interest of paramount importance."[90] Therefore, the court must weigh Oliver's

10 fundamental interest in freedom from unwanted medical treatment against the government's

11 interest in accurate identity based on gender,[91] determine whether the government has a

12 compelling interest for the Policy that outweighs Oliver's interest and, if so, determine the

13 Policy is narrowly tailored. In this case, the Secretary has not adequately met its burden to

14 justify the Policy with a compelling government interest or demonstrate that the Policy is

15 narrowly tailored to meet its interest, therefore the Policy is unconstitutional and summary

16 judgment is appropriate as a matter of law.

17           The Secretary has not demonstrated a compelling interest in requiring applicants who

18 are transgender to undergo medical treatment and receive doctor certification of gender because

19 the interest alleged by the Secretary in accurate identification of gender is undermined. The

20 Secretary establishes identity for passports using multiple factors,[92] therefore gender is not a

21 threshold factor. In addition, the Policy dismisses the supported idea that a binary gender

---

22 [88] *Flores*, 507 U.S. at 301.
[89] Motion at 14 (citing 8 FAM 101.1(f)(2)) (internal quotations omitted).
23 [90] *Id.* at 20.
[91] *Cruzan,* 497 U.S. at 279.
24 [92] *See* https://eforms.state.gov/Forms/ds11.pdf.

16

certified by a doctor is the only accurate gender of a person. Perpetuating the idea that the gender assigned at birth, without medical treatment, is the accurate gender ignores the reality that society is not a binary system and promotes inaccurate information on identifying documents. Nevertheless, if accurate identification of gender is a compelling interest, the Policy is not narrowly tailored to serve the interest because gender, verified by a doctor, is not the only or least restrictive means to serve that interest.

Federal law requires the Secretary to ensure a passport contains truthful and accurate information.[93] The Secretary's Passport Application Form (DS-11) requires a recent picture along with name, sex (male or female), date of birth, place of birth, Social Security number, address, name of parents, date of birth and place of birth of parents, occupation, name of employer, height, weight, eye color, and emergency contact information.[94] Identity can be established through this exhaustive, fifteen item list without resorting to gender. If the Secretary is not satisfied with the information and documentation provided, identity can also be established with an "identifying witness."[95] The Secretary previously stated that "sex designation . . . help[s] identify the bearer . . . and ensure[s] that the passport remains reliable proof of identification. . . ."[96] Despite this, the Secretary has not alleged anything more to support why accurate identification of sex designation is required for a passport to be accurate when multiple other factors can be used to sufficiently verify identity.

Here, the Secretary ignores the additional identifying factors required on the DS-11 and the less invasive alternative ways to prove identity and attempts to manufacture the gende designation as a threshold identification factor to elevate the need for the Policy to make the

---

[93] 22 U.S.C. §213.
[94] https://eforms.state.gov/Forms/ds11.pdf
[95] 22 C.F.R. § 51.23(b)
[96] Motion at 19-20.

1    passport an accurate identifying document. However, simply because the Secretary states

2    sex/gender designation is paramount to accurate identification does not make the argument

3    compelling. As a result, accuracy and identity in gender/sex designation is not a compelling

4    interest.

5          What the Secretary fails to acknowledge and the Policy ignores that if Oliver presents as

6    male, then accuracy is diminished when Oliver holds a passport with a female gender marker.

7    As indicated in the Amended Complaint, Oliver presents as a male.[97] His driver's license

8    indicates male.[98] Oliver cannot produce a doctor's note but the passport of Oliver must contain

9    truthful and accurate information,[99] so his passport will have a female gender marker. Having a

10   gender marker on a passport that does not reflect the bearer's gender does not add to accuracy,

11   it diminishes it. Having a doctor divine the gender of a patient does not add to accuracy because

12   fitting a transgender person into a binary model is not always accurate.  Therefore, not only

13   does the Secretary lack a rational interest for the Policy, the Secretary's reliance on a doctor's

14   note at all lacks support among health professionals. Consequently, the Secretary does not meet

15   the burden required for its interest in accuracy in gender designation to be a compelling interest

16   and the Policy is an unconstitutional violation of Oliver's fundamental right to refuse medical

17   treatment.

18         Even if accuracy in gender/sex designation is found to be a compelling interest, the

19   lengthy list of additional identifying facts required by the application and the alternate means of

20   proving identity undermines the necessity for gender to be doctor certified. The Secretary does

21   not have to rely solely on gender to identify a person. The Secretary may use a number of other

22   factors required by the passport application and, if not satisfied that the applicant can be

---

23   [97] FAC (Doc. #13) at ¶ 5.
     [98] *Id.* at 4, para. 16.
24   [99] 22 U.S.C. § 213.

1    identified, the Secretary has other means to confirm identity, as stated in 22 C.F.R. §51.23(b).

2    The unnecessarily invasive nature of the Policy when identity can be confirmed through other

3    means yields a too broad Policy that fails to meet strict scrutiny.

4    **B. The Secretary's Policy Violates the Equal Protection Clause of the Fifth
     Amendment in the U.S. Constitution**

5

6         The Equal Protection Clause of the Fifth Amendment prohibits the government from

7    discriminating based on sex.[100] This protection includes discrimination because a person is

8    transgender.[101] As the U.S. District Court for the District of Idaho states, "to conclude

9    discrimination based on gender identity or transsexual status is not discrimination based on sex

10   is to depart from advanced medical understanding in favor of archaic reasoning."[102] A

11   government policy that "on its face treats transgender persons differently than other persons"

12   requires "more than rational basis but less than strict scrutiny. . . ."[103] As a result, only if the

13   government proves the "classifications by gender [ ] serve important governmental objectives

14   and [ ] [are] substantially related to achievement of those objectives," will a government action

15   withstand intermediate scrutiny and be found constitutional.[104] Because the Policy, facially and

16   as-applied, discriminates against Oliver because he is transgender and the government has not

17   asserted a substantial government interest or demonstrated the Policy is substantially related to

18   serving that interest, summary judgment should be granted.

19

20

21

22   _____
     [100] *Reed*, 404 U.S. at 75 (1971)
     [101] *Karnoski v. Trump,* 926 F.3d 1180, 1201 (9ᵗʰ Cir. 2019).
23   [102] *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1144 (D. Idaho 2018)
     [103] *Karnoski,* 926 F.3d at 1201.
24   [104] *Craig*, 429 U.S. at 197 (1976)

1          *i.      The Policy discriminates against Oliver based on sex.*

2          Equal protection prohibits unequal treatment based on sex. A government action may be

3    found unconstitutional if the government rule discriminates on its face or as-applied. In

4    *Karnoski v. Trump*, the Plaintiffs were people who are transgender and active duty military or

5    who would like to join the military.[105] Specifically, the named plaintiff, Ryan Karnoski, aspired

6    to join the military but was prevented from doing so by the government action which prohibited

7    people who are transgender from joining the military.[106] The government action established

8    specifically that "'*[t]ransgender persons* with a history or diagnosis of gender dysphoria are

9    disqualified from military service, except under [certain] limited circumstances.'"[107] More

10   broadly, it stated that "'*[t]ransgender persons* who require or have undergone gender transition

11   are disqualified from military service,' and '*[t]ransgender persons* without a history or

12   diagnosis of gender dysphoria . . . may serve . . . in their biological sex.'"[108] The Ninth Circuit

13   concluded the policy was discriminatory on its face because it " treats transgender persons

14   differently than other persons."[109]

15         In the same way, the Policy here treats people who are transgender different than others.

16   By requiring doctor certification of "the appropriate transgender treatment," it singles out

17   transgender passport applicants. The requirement to seek medical certification of gender is not

18   imposed on cisgender applicants to verify their gender.    As the Secretary states, it

19   "particularizes this policy for the case in which the applicant seeks a passport reflecting the sex

20   component that is not established by his birth documentation."[110] Other gender issues unrelated

---

[105] *Karnoski,* 926 F.3d at 1186.
[106] *Id.,* 926 F.3d at 1189-90.
[107] *Id.,* 926 F.3d at 1201.
[108] *Id.*
[109] *Id.*
[110] Motion at 13

1    to gender transition, like a mistake on birth certificate, can be corrected without a doctor's

2    note.[111]

3           The Secretary created the Policy for transgender persons only. Therefore, the Secretary

4    must allege an important government interest and that the Policy is substantially related to that

5    interest to overcome intermediate scrutiny.

6           *ii.    The Secretary has failed to alleged an important government interest or that the
7    Policy is substantially related to serving that interest.*

8           Not only does Secretary lack a rational interest for the Policy, the Secretary's reliance on

9    a doctor's note lacks support among health professionals. The intermediate standard requires the

10   Policy to "significantly further[]" the government's important interests. . . ."[112] The Ninth

11   Circuit also promotes heightened scrutiny with an "as-applied rather than facial" approach to

12   avoid "broad constitutional judgments."[113] The Supreme Court in *U.S. v. Virginia* dictates that a

13   court considering "official classification based on gender" must "[f]ocus[ ] on the

14   differential treatment or denial of opportunity for which relief is sought...[to] determine

15   whether the proffered justification is 'exceedingly persuasive.'"[114] It further clarifies that "[t]he

16   burden of justification is demanding and it rests entirely on the State."[115] "The justification

17   must be genuine... [a]nd it must not rely on overbroad generalizations about the different

18   talents, capacities, or preferences of males and females."[116]

19          The government's interest in this case is accuracy in identification of the passport bearer

20   based on gender, which is undercut in multiple ways as explained *supra* (I)(A)(ii). While not

---

[111] 8 FAM 403.3-7; *see also* Motion at 14-15.
[112] *Karnoski,* 926 F.3d at 1202.
[113] *Id.,* 926 F.3d at 1200.
[114] *United States v. Virginia*, 518 U.S. 515, 532-33 (1996)
[115] *Virginia*, 518 U.S. at 533.
[116] *Id*.

21

1    classifying male and female individuals referenced in *Virginia*,[117] the Policy has a different

2    evidentiary standard for verifying identity of a transgender person that warrants intermediate

3    scrutiny.

4         Here, the Secretary has not alleged an "exceedingly persuasive" interest in the Policy.

5    The Secretary does not allege any facts except overbroad generalizations about people who are

6    transgender needing medical certification to establish an accurate gender for a passport. The

7    Secretary does not establish that a gender marker is only accurate if certified by a doctor.

8    Therefore, the Secretary has not met the heightened burden required to allow different treatment

9    of a person who is transgender, specifically by requiring medical treatment, in obtaining a

10   passport.

11   II.    THE SECRETARY VIOLATED THE ADMINISTRATIVE PROCEDURE ACT

12        Under the APA, this Court can "hold unlawful and set aside agency action, findings, and

13   conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

14   accordance with law."[118] If an agency does not engage in reasoned decision-making by providing

15   an adequate evidentiary basis for its action and consider all important aspects of the decision

16   before it, the agency's action is arbitrary and capricious. While the agency action is entitled to

17   some deference, if the agency "action is based upon a determination of law as to which the

18   reviewing authority of the courts does come into play, an order may not stand if the agency has

19   misconceived the law.[119]

20

21

22

---

[117] *Id.* (addressing exclusion of women in "citizen-soldier training afforded by V[irginia]
23   M[ilitary] I[nstitute].")
[118] 5 U.S.C. § 706(2)(A).
24   [119] *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)

1    In this case, if the Secretary has violated Oliver's due process right to be free of forced

2    medical treatment, then the Secretary's Policy violates the APA because it is contrary to law,[120]

3    and, if this Court does not find a Constitutional due process violation, then the Secretary's Policy

4    remains arbitrary and capricious because of its use of outdated information.[121]

5    **A. The Secretary's Policy Is Arbitrary and Capricious Because It Relies On Outdated Information**

6

7    The Secretary's Policy is arbitrary and capricious if the Policy does not "reflect the

8    current knowledge."[122]  Agency decisions resting on stale scientific data should be set aside as

9    arbitrary and capricious.[123]  Courts are all the more likely to deem agency actions relying on

10   stale data arbitrary and capricious if, as is the case here, the agency has access to more current

11   and accurate data.[124]

12   As argued in its Motion, the Secretary has used a 2001 Standards of Care manual from

13   WPATH.[125] This is an outdated medical report from 2001 when WPATH was known as "The

14   Harry Benjamin International Gender Dysphoria Association" and the focus, as reflected in the

15   Secretary's Policy, was gender dysphoria. WPATH changed its unfortunate name and issued

16   Version 7 of the Standards of Care in 2011, with a more appropriate view of the transgender

17

18   _____

[120] 5 U.S.C. § 706(2)(B).

19   [121] *Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 373 F.Supp.2d 1069, 1081 (E.D. Cal. 2004).

20   [122] *Rauenhorst v. U.S. DOT, FHA*, 95 F.3d 715, 723 (8th Cir. 1996).

[123] *Seattle Audobon Soc'y v. Espy,* 998 F.2d 699, 704 (9th Cir. 1993); *Desert Citizens of Am. V.*

21   *Bisson,* 231 F.3d 1172, 1188 (9th Cir. 2000).

[124] *Am. Horse Prot. Ass'n, Inc. v. Lyng*, 812 F.2d 1, 6-7 (D.C. Cir. 1986) (holding agency's

22   action arbitrary and capricious for failure to consider an intervening study about inhumane treatment of horses); *Golden Northwest Aluminum, Inc. v. Bonneville Power Adm'n*, 501 F.3d

23   1037, 1052 (9th Cir. 2007) (holding that an agency should have considered "changed market conditions").

24   [125] Motion at 4.

experience. This change coincides with DSM 5, which examines transgender and mental health in a more advanced and learned way.

The Secretary's Policy presumes that all transgender passport applicants have a sickness of mind or body because each applicant has gender dysphoria and needs a doctor' note. This presumption is at odds with the rapidly advancing understanding of the transgender population, viewing transgender as a normal process for some people and not as a pathology. The Secretary's reliance on a 2001 Version of the Standards of Care simply focuses on gender dysphoria and neglects the non-pathological transgender population. The Secretary does not take into account the rapidly advancing understanding of the transgender experience.

The Supreme Court has warned against reliance on outdated DSM or other scholarly treatises on psychiatry when "[t]he only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment."[126] The ever-developing nature of psychiatric research warrants constant updating, as the Supreme Court suggests:

> DSM-IV reflects a consensus about the classification and diagnosis of mental disorders derived at the time of its initial publication. New knowledge generated by research or clinical experience will undoubtedly lead to an increased understanding of the disorders included in DSM-IV, to the identification of new disorders, and to the removal of some disorders in future classifications. The text and criteria sets included in DSM-IV will require reconsideration in light of evolving new information.[127]

The Secretary's use of SOC 6 and its failure to update its understanding of transgender applicants creates an arbitrary and capricious doctor's note Policy.

**B.  The Secretary's Policy Violated The Administrative Procedures Act Because It Was Contrary To Law**

---

[126] *Clark v. Arizona,* 548 U.S. 548 U.S. 735, 774 (2006) (quoting *Greenwood v. United States*, 350 U.S. 366, 375 (1956)).

[127] *Id.*, 548 U.S. at 774 (citing DSM-IV at xxxiii).

1    The evaluation of whether the Secretary violated the APA because its decision was

2  contrary to law is described above at § I. As a result, if this Court finds the Secretary violated

3  the U.S. Constitution, the Secretary has also violated the APA. In this case, the Secretary

4  violated the Fifth Amendment Due Process Clause and Equal Protection Clause of the U.S.

5  Constitution and has not alleged a sufficient justification to support the discriminatory Policy.

6  Therefore, the Secretary violated the APA. Consequently, summary judgment should be granted

7  because there is no genuine issue of material fact and Oliver is entitled to judgment as a matter

8  of law.

9                               **CONCLUSION**

10    The Secretary has not alleged a genuine issue of material fact or a sufficient legal

11  argument to refute that the Policy violates Oliver's right to be free from unreasonable medical

12  treatment, denies equal protection, and is arbitrary, capricious, and contrary to law. Therefore,

13  Oliver is entitled to summary judgment as a matter of law. For these reasons, this Court should

14  grant Oliver's request for Summary Judgment and/or Petition for Judicial Review.

15    DATED this 24th day of December, 2019.

16

17

18          ___/s/ David Olshan_____
                 CHRISTENA GEORGAS-BURNS, ESQ.
19               Nevada Bar No. 14314C
                 DAVID OLSHAN, ESQ.
20               Nevada Bar No. 4126
                 NEVADA LEGAL SERVICES, INC.
21               530 S. 6th Street
                 Las Vegas, Nevada  89101
22               Attorneys for Plaintiff
                 (702) 386-0404
23               dolshan@nlslaw.net

24

                                   25

1

<u>Certificate of Service</u>

2        I hereby certify on this 24th day of December, 2019, I served the foregoing Motion for

3    Summary Judgment/Memorandum of Points and Authorities by sending it to a registered user by

4    filing it with the court's electronic-filing system in accordance with Fed. R. Civ. P. 5(b)(2)(E) to

5    the following:

6                                    JOSEPH H. HUNT
                                  Assistant Attorney General
7                                       Civil Division

8                                 ANTHONY J. COPPOLINO
                                        Deputy Director
9
                                  BENJAMIN T. TAKEMOTO
10                                   (DC Bar # 1045253)
                                         Trial Attorney
11                                 U.S. Department of Justice
                                   Attorneys for Defendant
12
     <u>/s/ David Olshan, Esq.</u>
13   David Olshan
     Nevada Bar No. 4126
14   Nevada Legal Services, Inc.
     Attorney for Plaintiff
15

16

17

18

19

20

21

22

23

24